UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL |
| | ) | |
| Plaintiff, | ) | Houston, Texas |
| | ) | Thursday, May 29, 2014 |
| vs. | ) | (10:17 a.m. to 11:32 a.m.) |
| | ) | |
| SHMOU ALI ALRAWABDEH, | ) | CASE NO: 4:14-MJ-492-01 |
| ALI MAHMOOD AWAD IRSAN, | ) | CASE NO: 4:14-MJ-493-01 |
| | ) | |
| Defendants. | ) | |

PRELIMINARY EXAMINATION / DETENTION HEARING

BEFORE THE HONORABLE NANCY K. JOHNSON,
UNITED STATES MAGISTRATE JUDGE

Appearances:            See Next Page

Court Recorder:         Paul Yebernetsky

Transcriber:            Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>


Plaintiff:                        JAMES DONALD MC ALISTER, ESQ.
                                  MARK McINTYRE, ESQ.
                                  Office of the U.S. Attorney
                                  1000 Louisiana, Suite 2300
                                  Houston, Texas 77002


Shmou Ali Alrawabdeh:             MARINA THAIS DOUENAT, ESQ.
                                  Assistant Federal Public Defender
                                  440 Louisiana, Suite 1350
                                  Houston, Texas 77002


Ali Mahmood Awad Irsan:           MARK ANTHONY DIAZ, ESQ.
                                  3935 N. Main
                                  Houston, TX 77009

<u>INDEX</u>

| <u>GOVERNMENT'S WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| GARY DICKENS | | | | |
|   BY MR. MC ALISTER | 7 | | | |
|   BY MR. DIAZ | | 31 | | |
|   BY MS. DOUENAT | | 36 | | |

1        **Houston, Texas; Thursday, May 29, 2014; 10:17 a.m.**

2                      **(Call to Order)**

3            **THE COURT:**  All right.  Let me next call for probable

4    cause and detention hearing, *United States versus Shmou Ali*

5    *Alrawabdeh and Ali Mahmood Awad Irsan.*

6            **MR. IMPERATO:**  Judge, I don't believe there's any

7    other matters.  May we be excused?

8            **THE COURT:**  That's right.  You may be excused.

9            **MR. IMPERATO:**  Thank you.

10           **MR. MC ALISTER:**  Jim McAlister and Mark McIntyre for

11   the Government.

12           **THE COURT:**  All right, we're here for a hearing.  Are

13   we ready?

14           **MS. DOUENAT:**  Your Honor, Ms. Ali Alrawabdeh, we

15   would request if we could just at least get an extension until

16   Monday.  We just are still trying to get a couple witnesses and

17   get some medical records to disclose to the Court for our

18   hearing.  And I do understand that --

19           **THE COURT:**  Can we start today and you -- we can

20   continue the hearing and allow you --

21           **MS. DOUENAT:**  If the Court wants to do that, that --

22           **THE COURT:**  -- I can give you additional time to

23   bring more information in.

24           **MS. DOUENAT:**  And, your Honor, if that's what the

25   Court wants to do, that's fine.  It's just that I understand

1    that another Co-defendant will be probably with counsel on

2    Monday if the Court wanted to just have them all at the same

3    time, then we could do them then.

4            THE COURT:  I have no confidence of that.  So --

5            MS. DOUENAT:  Okay.

6            THE COURT:  -- you know, I mean, I don't want you-all

7    to wait until those, you know -- I don't know.  I think --

8    what's your position, Mr. Diaz?

9            MR. DIAZ:  My position was going to be that we will

10   be -- we would wait.  In other words, it would probably be

11   easier to have them all at one time.  And I'm in a different

12   situation than maybe the Co-defendants are.  So --

13           THE COURT:  All right.  I think -- you're ready to go

14   forward today?

15           MR. MC ALISTER:  We are, your Honor.

16           THE COURT:  All right.  Let's start the hearing and

17   then --

18           MS. DOUENAT:  We'll put on our case on Monday.

19           THE COURT:  Put on your case on Monday.  I -- Monday,

20   Shannon, I think I'm good right?  Monday, I've got --

21           THE CLERK:  You're going to do a hearing with -- oh,

22   okay, I guess since you started it.

23           THE COURT:  I've got that doctor appointment at

24   10:00.  We can do the afternoon.

25           MS. DOUENAT:  That works, your Honor.

1          **THE COURT:**  Does that work, 2:00 o'clock?  At 2:00

2    o'clock on Monday?  Does that work, Mr. Diaz?

3          **DEFENDANT ALRAWEBDEH:**  Yes, your Honor.

4          **MR. DIAZ:**  That's fine, your Honor.

5          **THE COURT:**  Okay.  I mean, assuming that -- if you

6    want to put on any extra testimony.

7          **MR. DIAZ:**  And I likely will not need to.

8          **THE COURT:**  Okay.  So if you think you're finished

9    today, then I can rule today but if you want to put on any

10   extra testimony, Monday at 2:00 o'clock then.

11         **MS. DOUENAT:**  For us, yes.

12         **THE COURT:**  Yes.

13         **MS. DOUENAT:**  We would like to put on more testimony.

14         **THE COURT:**  Okay, all right.

15         **MS. DOUENAT:**  But we will definitely have no problems

16   with Government putting on their case this morning.

17         **THE COURT:**  Good enough.  Then have a seat.

18         **MR. MC ALISTER:**  May I proceed, your Honor?

19         The Government calls Gary Dickens.

20         **THE CLERK:**  Raise your right hand, please.

21          **GARY DICKENS, GOVERNMENT'S WITNESS, SWORN**

22         **THE CLERK:**  You may be seated.

23   //

24   //

25   //

1                        **DIRECT EXAMINATION**

2    **BY MR. MC ALISTER:**

3    Q    Agent Dickens, would you please state your full name for

4    the Court?

5    A    It's Gary, G-a-r-y, Dickens, D-i-c-k-e-n-s.

6    Q    And how are you employed?

7    A    I'm employed as a special agent with the Social Security

8    Administration's Office of the Inspector General.

9    Q    And what do you investigate in your employment capacity?

10   A    Our primary mission is to investigate fraud, waste and

11   abuse within the programs administered by the Social Security

12   Administration.

13   Q    And are you familiar with an individual named Ali Irsan?

14   A    Yes.

15   Q    Are you familiar with an individual named --

16          **MR. MC ALISTER:**  Your Honor, for the record, is Shmou

17   the proper way to pronounce --

18          **DEFENDANT ALRAWABDEH:**  Yes.

19          **THE COURT:**  Okay.

20   **BY MR. MC ALISTER:**

21   Q    -- Ms. Shmou Alrawabdeh?

22   A    Yes.

23   Q    Okay.  And those are the two individuals that we're here

24   to talk about today, correct?

25   A    Yes.

Dickens - Direct / By Mr. McAlister                    8

1  Q    Okay.  Let me go forward with you and talk about the

2  probable cause aspect of this case first and then after that,

3  we'll talk about the reasons for detention, okay?

4  A    Okay.

5  Q    So just on the social security case, can you tell me

6  whether or not Mr. Irsan and Ms. Alrawabdeh -- do they receive

7  benefits from the Government?

8  A    Yes, they do.  Both receive Supplemental Security Income

9  benefits which is known as "SSI."

10 Q    Okay.  And can you tell the Court, the SSI benefits, what

11 makes you eligible to receive SSI benefits?

12 A    Well, SSI is a public assistance program.  There's

13 primarily two qualifications.  One's you -- one, you have to be

14 -- that you suffer from some disability and, two, that you --

15 that it is -- it's a resource tested.  So you have to be

16 resource eligible.  So it is reserved for the truly indigent

17 and disabled of either residents -- permanent residents or

18 United States citizens.

19 Q    For our purposes today, you've had an opportunity to

20 review the files of Ms. Alrawabdeh and Mr. Irsan; is that

21 correct?

22 A    Yes.

23 Q    Okay.  We are going to talk today simply about the

24 resource element of that qualification, whether or not they had

25 assets that they did not report, okay?

Dickens – Direct / By Mr. McAlister                                    9

1   A    Okay.

2   Q    Is it fair to say that the Defendants in this case, if

3   they had assets that they didn't report, that would constitute

4   fraud and if they made false statements to obtain those assets,

5   that would constitute fraud?

6   A    Yes.

7   Q    Okay.  And that's under 18 U.S.C. 371 and under 42 U.S.C.

8   1383 and under 18 U.S.C. 641 which is what's charged in the

9   complaint; is that correct?

10  A    Correct.

11  Q    And before I get into the facts, do you see Mr. Ali Irsan

12  in the courtroom here today?

13  A    Yes, he's seated at the table there in the orange

14  jumpsuit.

15          **MR. MC ALISTER:**  Your Honor, I'd ask the record to

16  reflect that the witness has identified Mr. Irsan.

17          **THE COURT:**  It will.

18  **BY MR. MC ALISTER:**

19  Q    And do you see Ms. Alrawabdeh?

20  A    Yes, seated in that green jumpsuit.

21          **MR. MC ALISTER:**  I'd ask the record reflect that the

22  witness has identified Ms. Alrawabdeh.

23          **THE COURT:**  It will, yes.

24  //

25  //

 1  **BY MR. MC ALISTER:**

 2  Q    Are these the two individuals that you reviewed the files

 3  on and that are receiving SSI benefits?

 4  A    Yes.

 5  Q    Can you tell the Court when Mr. Irsan initially started

 6  receiving benefits?  It doesn't have to be the exact date, just

 7  about.

 8  A    2002.  I think December 2002 was the first month that he

 9  was paid.

10  Q    Okay.  And then Ms. Alrawabdeh, do you know when she

11  started receiving her benefits?

12  A    End of 2004.

13  Q    So at the time when they started receiving their benefits,

14  would they have had to make representations regarding their

15  assets?

16  A    Yes, they would have.

17  Q    Okay.  And what's the -- kind of the guideline amount of

18  assets that would disqualify them?

19  A    Two thousand dollars individually is the resource limit

20  that anybody could have and that could be property, vehicles,

21  anything.  Anything that could be deemed valuable would go

22  towards that resource limit, insurance policies, anything.

23  Q    Okay.  And there are a few exceptions.  You're allowed to

24  have one vehicle and a residence?

25  A    And your primary residence, that's correct.

1  Q    Primary residence.  Also at some point in time, Mr. Irsan

2  and Ms. Alrawabdeh indicated to Social Security that they were

3  married; is that right?

4  A    Yes.  At Ms. Alrawabdeh's initial application for SSI,

5  they -- the Social Security Administration created a couples'

6  record based on statements from both Mr. Irsan and

7  Ms. Alrawabdeh that they were married.

8  Q    And they -- their primary residence, I think, is 19150

9  Irwin Keel in Conroe?

10 A    Yes.

11 Q    Okay.  Now, when they did that, did they find that their

12 benefits got slightly reduced?

13 A    Yes.  Mr. Irsan was already receiving SSI benefits at that

14 time and they received a notification from the Social Security

15 Administration illustrating how -- as a couple's record is what

16 Social Security would consider it -- how each other's SSI

17 benefits affect one another.

18 Q    Then shortly after they received this notice in about May

19 of 2005, did the story change on whether they lived together

20 and whether they were married?

21 A    Yes, it did.

22 Q    And how did it change?

23 A    At that point, they informed the Social Security

24 Administration that they were not married and that

25 Ms. Alrawabdeh lived at a residence at 19160 Irwin Keel and

1   that they were separated anyway and that Mr. Irsan lived at

2   19150 Irwin Keel.

3   Q    And we'll come back and talk about those residences in a

4   moment.

5   A    Sure.

6   Q    So according to them then, they'd been divorced or not

7   married for over eight or nine years?

8   A    Correct.

9   Q    But just for the record, they do have a three-year-old

10  child, correct?

11  A    That is correct.

12  Q    And based on your investigation, have you found that --

13  through surveillance and other FBI work that, in fact, they do

14  continue to reside together and act as man and wife?

15  A    Yes.  Multiple witnesses have them living together and

16  presenting themselves as husband and wife.

17  Q    So at this point, you have probable cause to believe that

18  they didn't tell the Social Security Administration the truth

19  about their residences?

20  A    Yes.

21  Q    And that was in order to get their benefits increased if

22  they lived apart?

23  A    That's correct.

24  Q    Let me talk now about assets and I just want to go through

25  a list of some assets and determine whether or not these were

```
                    Dickens - Direct / By Mr. McAlister              13
```

1   reported to Social Security and whether or not upon your

2   investigation, you believe these assets belong to

3   Ms. Alrawabdeh and Mr. Irsan.

4   A    Okay.

5   Q    First, let's talk about bank accounts.  In your

6   investigation, did you find that there was a bank account in

7   the name of Nadia Irsan?

8   A    We did.

9   Q    Okay.  And where was that bank account?

10  A    It was a Chase Bank account.

11  Q    And based on your investigation, did you find whether or

12  not Ms. Nadia Irsan was employed?  Did she have some source of

13  income that would --

14  A    No.  Ms. Irsan -- I mean, Nadia Irsan has never reported

15  any form of earned or unearned income to the United States

16  Government.

17  Q    And did you have an opportunity then to subpoena the bank

18  account records for a portion or a date, say, between July '06

19  and April of '12?

20  A    We did.

21  Q    And what did you find was the total amount that was

22  deposited into that account?

23  A    I believe it was over $250,000.

24  Q    And of that amount that was deposited into the account,

25  there was about 95,000 in cash?

1  A    Yes, over $95,000 in cash deposits during that time

2  period.

3  Q    And how about checks --

4  A    I --

5  Q    -- a hundred and fifty-nine, sixty?

6  A    It was over a hundred and a hundred and fifteen thousand

7  dollars' worth of those checks were made payable to either

8  Mr. Ali Irsan or Shmou Alrawabdeh.

9  Q    And you even went to the point of getting some specifics

10 and contacted an entity called "One World Technologies."  And

11 what was the information obtained from them?

12 A    They informed us that the 75,000-dollar check was made

13 payable to Mr. Ali Irsan due to an injury that he incurred

14 while operating a Ryobi saw.

15 Q    And then he deposited that check into Nadia Irsan's

16 account, correct?

17 A    That is correct.

18 Q    So at least half of that account contained money from

19 Ms. Alrawabdeh and Mr. Irsan?

20 A    Correct.

21 Q    Should that bank account information have been reported to

22 SSI?

23 A    Absolutely.

24 Q    Would it have made them ineligible to receive these

25 benefits if SSI had known that they had this resource?

1   A    Yes.

2   Q    So from July of '06 to April of '12, they had assets that

3   they failed to report?

4   A    Yes.

5   Q    Now, you had an opportunity then to check the balance in

6   that account as recently as May 28th of 2014?

7   A    Yes.

8   Q    What was the balance in that account as recently as this

9   week?

10  A    As of yesterday, it was over $91,000.

11  Q    And, again, if that account is held by Nadia for her

12  mother and father, that should have been reported to SSI and

13  would have made them ineligible for the benefits?

14  A    Correct.

15  Q    In your investigation, did you also find that multiple

16  pieces of real estate had been purchased by Nadia Irsan?

17  A    Yes.

18  Q    And did Mr. Irsan have anything to do with the purchases

19  of those properties?

20  A    Yes.  The information that we obtained during the

21  investigation states that he directed Nadia Irsan to purchase

22  those properties.

23  Q    And he actually negotiated over some of the purchases; is

24  that correct?

25  A    That's the information we obtained.

1    Q    Let me go down a list.  There was a piece of property

2    purchased at Old Houston Road by Nadia in 2009; is that

3    correct?

4    A    Correct.

5    Q    And was that purchased for approximately $28,000 in cash?

6    A    Yes.

7    Q    There was a piece of property purchased at White Oak in

8    2009 about the same time by Nadia for approximately 24,000 in

9    cash; is that correct?

10   A    That's correct.

11   Q    There was also a property purchased at 19201 in Conroe for

12   38,000 -- I'm sorry -- 19201 Irwin Keel.

13   A    That's correct.

14   Q    And that was for about 38,000?

15   A    Yes.

16   Q    Now, that property's name is both in Nadia's and in

17   Ms. Alrawabdeh?

18   A    That is correct.

19   Q    If the -- Mr. Irsan and Ms. Alrawabdeh were participants

20   in these real estate transactions, would those have been assets

21   that should have been reported to SSI?

22   A    Yes.

23   Q    And would the purchase of those assets and the fact that

24   they had cash to do it make them ineligible for SSI?

25   A    Yes, the cash and/or the properties would both make them

1    ineligible.

2    Q     In addition to that in your investigation and in the FBI's

3    investigation, did you find that they purchased vehicles for

4    the family?

5    A     Yes.

6    Q     And did it seem that the vehicles purchased for the family

7    were purchased again with cash?

8    A     Yes.

9    Q     So the family had ready sources of cash available to make

10   these purchases.  They didn't have to finance them?

11   A     That's correct.

12   Q     And just as a couple of examples without going through all

13   of them, Nadia purchased a vehicle in May 2011, a Toyota

14   Corolla; is that correct?

15   A     Yes.

16   Q     And she paid about $15,000 in cash for that vehicle?

17   A     Yes.

18   Q     And then there was a vehicle purchased for Ms. Alrawabdeh

19   in February of 2010, a Toyota Camry?

20   A     Correct.

21   Q     And that was purchased for about 16,000, right?

22   A     Yes.

23   Q     And they charged a portion of that on credit cards and

24   then put 5,000 in cash down on that?

25   A     Yes.

```
                    Dickens - Direct / By Mr. McAlister              18
```

1  Q    And, again, this is cash and no one that we know of in the

2  entire family has a job?

3  A    No.

4  Q    Let me turn now and talk to you about some issues on bond.

5  The Court's going to consider whether or not to release

6  Ms. Alrawabdeh and Mr. Irsan on bond.

7  A    Okay.

8  Q    Are you familiar with an investigation by Harris County

9  regarding some killings that are associated with the Irsan

10 family?

11 A    Yes.

12 Q    Okay.  Mr. Irsan has a daughter Nasemah?

13 A    Nesreen?

14 Q    There was another daughter named Nasemah Irsan.

15 A    Nasemah.

16 Q    Nasemah, I'm sorry.  And her husband was Amjad Alidam?

17 A    Correct.

18 Q    And can you tell the Court what happened to Mr. Alidam in

19 1999?

20 A    Yes.  In 1999 -- September 1999, Mr. Alidam was found dead

21 at 19150 Irwin Keel.

22 Q    Now, is that residence of anyone?

23 A    Yes.  That's Mr. Irsan and Ms. Alrawabdeh's primary

24 residence.

25 Q    Was there any trial, any subsequent proceedings on that

1    1999 shooting?

2    A    No.  Mr. Irsan claimed that the -- that Mr. -- that Amjad

3    entered the house and threatened him, threatened to kill his

4    family with a pistol and he was -- that he shot him in self-

5    defense.

6    Q    So in '99, it was a self-defense claim?

7    A    Yes, that's correct.

8    Q    But there's no question that the shooter in that instance

9    was Mr. Irsan?

10   A    No.

11   Q    Let me jump ahead in time to another investigation

12   involving Gelareh Bagherzadeh.

13   A    Yes.

14   Q    Can you tell the Court anything about that?

15   A    Gelareh Bagherzadeh was murdered -- was found shot and

16   killed on January 15th of 2012 outside of her parents'

17   apartment in the Galleria area.

18   Q    Do you know whether or not anybody has been charged with

19   that offense?

20   A    Yes, Mr. Ali Irsan has been indicted for the murder of

21   Gelareh Bagherzadeh.

22   Q    So he's under indictment for murder in Harris County,

23   Texas at this moment?

24   A    Yes.

25   Q    And for the death of Ms. Bagherzadeh?

```
                  Dickens - Direct / By Mr. McAlister                20
```

1   A     Yes.

2   Q     Let me go down one -- oh, by the way -- and we'll go into

3   more detail about this in a moment but Ms. Bagherzadeh was a

4   close friend with Mr. Irsan's daughter Nesreen Irsan; is that

5   correct?

6   A     That is correct.

7   Q     Let me ask you about an investigation involving an

8   individual named Coty Beavers.  Can you tell the Court about

9   that homicide investigation?

10  A     Coty Beavers was found shot and killed in his apartment on

11  November 12th, 2012 here in Harris County.

12  Q     What was Mr. Beavers' relationship to the Irsan family?

13  A     Mr. Beavers was married to Mr. Irsan's daughter, Nesreen

14  Irsan.

15  Q     So Coty Beavers was Mr. Irsan's son-in-law?

16  A     Correct.

17  Q     And Mr. Amjad was Mr. Irsan's son-in-law?

18  A     That is correct.

19  Q     So two son-in-laws of Mr. Irsan have been murdered and one

20  close friend of his daughter has been murdered, correct?

21  A     That is correct.

22  Q     Let me ask you to tell the Court about an individual named

23  Nesreen Irsan.

24  A     Okay.

25  Q     Who is she?

1  A    Nesreen is the daughter of Ali Irsan and Robin Jacobs.

2  Q    So that would have been Mr. Irsan's first wife?

3  A    Correct.

4  Q    Okay.  Did Nesreen live with Mr. Irsan and Mrs. Alrawabdeh

5  until about 2011 -- June of 2011?

6  A    Yes.  In June 2011, Nesreen Irsan ran away from home --

7  ran away from Mr. Irsan and Ms. Alrawabdeh's house at 19150

8  Irwin Keel.

9  Q    Now, Ms. -- Nesreen was not 12 years old.  She was in her

10 20s; is that correct?

11 A    That's correct.

12 Q    Okay.  So she left home and then she got married; is that

13 correct?

14 A    Yes, she married Coty Beavers.

15 Q    And that's the individual that you just described as part

16 of the murder case?

17 A    Yes.

18 Q    Did Nesreen also obtain a temporary protective order and

19 eventually a protective order against her father?

20 A    Yes.  I believe it was a month after she left home, she

21 obtained a protective order against Mr. Alrawabdeh -- I mean,

22 Mr. Irsan.

23 Q    Irsan.  About July of 2011?

24 A    Correct.

25 Q    And as part of the typical protective order, an individual

1   is supposed to stay away from the person who's protected; is

2   that correct?

3   A    Yes.

4   Q    And not seek them out or try to find them; is that

5   correct?

6   A    Yes.

7   Q    And is it fair to say that Nesreen was in hiding and

8   afraid of her father?

9   A    Yes.

10  Q    Let me turn for a moment and talk about Ms. Alrawabdeh.

11  Do you have any evidence in your investigation that after the

12  protective order, Ms. Alrawabdeh made any efforts to help

13  Mr. Irsan find Nesreen and Coty Beavers?

14  A    Yes.  Witnesses were interviewed from the time period

15  after Nesreen left the house in June 2011, I believe, all the

16  way until November of 2011 that stated Ms. Alrawabdeh assisted

17  Mr. Irsan in attempting to locate Nesreen and Coty Beavers.

18  Q    Do you know whether or not Ms. Alrawabdeh contacted Coty

19  Beavers' mother, Shirley McCormick, in an effort to find where

20  they were located?

21  A    She did via phone call.

22  Q    During the search of the properties that we just described

23  that were assets of the Irsan family, I mentioned an Old

24  Houston Road address.  Do you recall that?

25  A    Yes.

Dickens – Direct / By Mr. McAlister                    23

1  Q     There was a search warrant conducted at that address.  Can

2  you tell the Court, was anything found there that would be

3  relevant to the death of Coty Beavers?

4  A     Yes, there was.

5  Q     Can you tell the Court what items were found?

6  A     Several items including a color photograph of Coty Beavers

7  which was a flyer that was handed out in the neighborhood of

8  his mother in 2011 in an attempt to locate Nesreen and Coty.

9  There was also documents from Intelius which is an online

10  consumer database.  It's a search database where you -- it's a

11  pay for -- service paid where you pay, set up an account and

12  you can put in people's identifiers and it will give you their

13  address information and even their dates of birth, vehicle

14  information.

15  Q     Was there a list or a piece of paper containing personal

16  information about Coty Beavers such as the kind of car he

17  drove, his family members, phone numbers?

18  A     Yes.  All of that was on the piece of paper, including his

19  -- if I'm not mistaken, his mother's identifiers, the license

20  plate to his vehicle.

21  Q     Shortly before the search warrant was executed, who was

22  seen exiting the residence where these materials were found?

23  A     Mr. Ali Irsan and Shmou Alrawabdeh exited the residence

24  together on the morning of May 22nd of this year.

25  Q     And did Ms. Alrawabdeh make any claims to the police

1   regarding the materials in that house?

2   A    Yes, she did.  She claimed that everything at Old Houston

3   Road belonged to her.

4   Q    Even though Mr. Ali Irsan was also seen leaving the house

5   as well?

6   A    Yes.

7   Q    Okay.  Let me talk about -- you mentioned a moment ago

8   that there was a flyer -- a flyer or picture found at the Old

9   Houston address.  Can you tell me whether any individuals or

10  witnesses that reported Ms. Alrawabdeh and Mr. Irsan trying to

11  locate Coty Beavers and Nesreen?

12  A    Yes.  We were even provided -- or law enforcement was

13  provided at some point a copy of the flyer in which Mr. Irsan

14  offered to pay up to a hundred dollars for information leading

15  to the location of Nesreen and Coty Beavers.

16  Q    And the neighborhood they were looking in, was it called

17  "Tealgate"?

18  A    Yes, it was in Spring.

19  Q    Okay.  And is that where Coty Beavers and his family at

20  least lived at one time?

21  A    Yes.  Coty, Nesreen and his mother all resided there.

22  Q    And Mr. Irsan and Ms. Alrawabdeh were both seen in that

23  neighborhood looking for them passing out flyers with Coty's

24  picture?

25  A    Yes and this was after the protective order.

Dickens – Direct / By Mr. McAlister                          25

1   Q    Exactly.  It was after the protective order had been

2   obtained by Nesreen?

3   A    Correct.

4   Q    It was also -- they were out there looking and this was

5   after the death of Gelareh?  They continued to search even

6   after that time?

7   A    That is correct.

8   Q    I want to talk to you specifically about Ms. Alrawabdeh

9   for a moment.  The death of Gelareh Bagherzadeh took place on

10  January 15th of 2012; is that correct?  Is that correct?

11  A    Yes.

12  Q    The location of the murder was at 894 Augusta in Houston?

13  A    Yes.

14  Q    Can you tell the Court, was there any evidence found that

15  Mr. Irsan and Ms. Alrawabdeh were leaving that location?

16  A    Yes, there was.  There was a witness that reported seeing

17  a newer model silver vehicle leave the location where Gelareh

18  Bagherzadeh was murdered.

19  Q    And that was at about 23:44 p.m.?

20  A    That is correct.

21  Q    Then after midnight, about 44 or 45 minutes later, was

22  Mr. Irsan contacted or stopped in his vehicle?

23  A    Yes.  Approximately 44 minutes after Gelareh Bagherzadeh

24  was murdered, Mr. Irsan and Ms. Alrawabdeh were stopped on I-45

25  northbound by DPS.

Dickens – Direct / By Mr. McAlister                    26

1    Q    And what kind of car were they driving?  What color was

2    it?

3    A    A silver Toyota Camry.

4    Q    And they were heading to Conroe or heading back to where

5    the Irsans reside?

6    A    Yes, they were northbound on I-45.

7    Q    Mr. Irsan was definitely in the car.  He was the driver,

8    correct?

9    A    That is correct.

10   Q    Was Ms. Alrawabdeh also in the car with him at that time?

11   A    Yes, she was.

12   Q    So they were both together within 45 minutes after the

13   murder of Gelareh?

14   A    That's correct.

15   Q    And they were both going from Houston where the murder

16   took place towards Conroe?

17   A    Yes.

18   Q    Now, during the investigation, was there any effort made

19   to determine how long it would take to drive from the Augusta

20   location where the murder took place to the point where

21   Mr. Irsan and Mr. -- Ms. Alrawabdeh were stopped?

22   A    HPD Homicide detectives drove the route out again at the

23   same time of day and found that it took them the same amount of

24   time to get there, the approximately 44 minutes, as to when

25   Mr. Irsan and Ms. Alrawabdeh were stopped from the murder

1    scene.

2    Q    Let me jump now and start talking about some issues from

3    the search warrant.  When the search warrant was conducted at

4    the house, were there any items found that would pose a danger

5    to the children of Ms. Alrawabdeh?

6    A    Yes, there were.

7    Q    Could you tell the Court what items were found that could

8    pose a danger if she was released on bond?

9    A    There were large amounts of prescription drugs, more than

10   what any reasonable person would consider reasonable use and

11   Percocet is the one that stands out to me that was found almost

12   in every room of the house.  It was found in hidden areas,

13   underneath the kids' dressers, like I said, in almost every

14   room, I believe.

15   Q    And the children at this house range from the age of 3 up

16   to 17 years old that would have access to these drugs that are

17   around the house?

18   A    Correct, the minors in the house, yes.

19   Q    And those children are presently in CPS custody; is that

20   correct?

21   A    All except for one --

22   Q    The minor children?

23   A    Yes.

24   Q    Let me ask you now about what we call "risk of flight"

25   issues.  In your examination of the facts, did you have any

1   opportunity to determine whether or not Mr. Irsan and

2   Ms. Alrawabdeh leave the country on a regular basis?

3   A     Yes, they do.

4   Q     And just in a short period of time, Ms. Alrawabdeh has

5   been to Jordan at least three times since 2012; is that

6   correct?

7   A     Yes.

8   Q     And if you look further back in history, even more times

9   than that?

10  A     Yes.

11  Q     Also, Mr. Ali has been out of the country numerous times;

12  is that correct?

13  A     Yes.

14  Q     And just in -- from 2011 to 2014, he's been to Jordan

15  twice; is that right?

16  A     At least twice.

17  Q     All right.  I want to ask you one other thing just as a

18  note.  When Ms. Alrawabdeh was coming back into the country in

19  January of 2014, was she stopped and was there an examination

20  made of her property?

21  A     Yes.  She was stopped by Customs and Border Protection

22  upon entering the country where she was searched.  A search of

23  her -- the cellular phone in her possession was searched and a

24  phone number was -- of interest was found in there.

25  Q     Was it actually the phone number of one of the murder

1   victims?

2   A    It was the name and phone number of Gelareh Bagherzadeh.

3   Q    In your investigation, did you also find that Mr. Irsan

4   and Ms. Alrawabdeh had ties in Jordan -- in other words, other

5   family members in Jordan?

6   A    Yes.

7   Q    And do you know probably not the names but any relations,

8   grandparents, brothers, sisters?

9   A    For sure, Mr. Irsan's brother Calid (phonetic) Alrawabdeh.

10  Q    Okay.  And then Ms. Alrawabdeh has family that she goes to

11  see in Jordan and she told us that in one of the interviews?

12  A    That's correct.

13  Q    Let me go back to the search of the houses again.  During

14  the search of the houses, did agents find credit cards?

15  A    Over 200.

16  Q    Over 200 credit cards.  And were these credit cards in the

17  name of Mr. Irsan and Ms. Alrawabdeh?

18  A    Some of them were.

19  Q    And were there also names found of credit cards in the

20  names of relatives that don't even live there?

21  A    That is correct.

22  Q    And, in fact, one relative, according to Nesreen, is

23  deceased?

24  A    Yes.

25  Q    Did Mr. Irsan's credit cards have multiple variations of

Dickens – Direct / By Mr. McAlister                    30

1   his name?

2   A    Yes, they did.

3   Q    And can you tell the Court what I mean by "variations of

4   the name"?

5   A    In some cases, his last name was listed as Irsan and some

6   -- I believe there were a few where his last name was listed as

7   Alrawabdeh, Ali Mahmood, Ali Awad, just different variations of

8   his name on the cards.

9   Q    And we haven't had a chance to look into whether all the

10  dates of birth and socials match on these but just on the face

11  of the credit cards, there appears to be multiple names and

12  identities?

13  A    That's correct.  Based on my experience in those

14  investigations, yes.

15  Q    There were 200 credit cards found in the house in various

16  rooms.  Were there also credit cards found in Mr. Irsan's

17  wallet or his wallets?

18  A    Yes.  He had over 40 credit cards in two wallets that were

19  in his wallets at the time of his arrest.

20  Q    And Ms. Alrawabdeh, did she also have credit cards in her

21  wallet?

22  A    Yes, she had over 20.

23         **MR. MC ALISTER:**  May I have a moment, your Honor?

24         **THE COURT:**  You may.

25         Were her credit cards in her name, if you know?

Dickens – Cross / By Mr. Diaz                    31

1        **THE WITNESS:**  Not all of them, no.  She had one in

2  the name of the brother who's believed to be deceased, Usef

3  (phonetic) Alrawabdeh and --

4        **MR. MC ALISTER:**  I pass the witness, your Honor.

5        **THE COURT:**  All right.

6        Mr. Diaz?

7        **MR. DIAZ:**  May I proceed, your Honor?

8        **THE COURT:**  Yes.

9                      **CROSS EXAMINATION**

10  BY MR. DIAZ:

11  Q    Agent Dickens, you said that you had witnesses that

12  Mr. Irsan presented -- that these two presented themselves as

13  husband and wife; is that correct?

14  A    Yes.

15  Q    Did you search any public records to see if there was a

16  marriage certificate or any type of documentation establishing

17  that here in the United States?

18  A    No.  During the investigation, both of them are -- have

19  disclosed that they -- you know, to Social Security and others

20  that they were married in Jordan.

21  Q    Okay.  And my question was, did you search any records

22  here in the United States that indicated that they were legally

23  married here?

24  A    No.

25  Q    In regards to a bank account, the bank account is not

Dickens – Cross / By Mr. Diaz                                    32

1    actually attached to Mr. Irsan; is that correct?

2    A    That's correct.

3    Q    And you said that there were a lot of cash deposits.  I

4    think you said 95,000 in cash in deposits during the time

5    period you looked, correct?

6    A    Yes.

7    Q    Okay.  Did you ever observe or do you know who made those

8    cash deposits?

9    A    No.

10   Q    You said there were several checks.  For example, one was

11   a check from One World Technology for $75,000 and you

12   investigated and that was the result of a claim that he made of

13   being injured with a Ryobi saw, correct?

14   A    Correct.

15   Q    Okay.  Do you know or did you investigate as to how much

16   medical bills might have been in regards to that injury?

17   A    No.

18   Q    During the time period that you checked into this bank

19   account, were there any withdrawals by Mr. Irsan?

20   A    No.

21   Q    Were there payments made from that account to Mr. Irsan?

22   A    No.

23   Q    Did you check into how funds were disbursed from the

24   account?

25   A    Yes.

1  Q    And they were not to Mr. Irsan?

2  A    No, they weren't.

3  Q    Next, I believe you said that there were properties owned

4  by Nadia; is that correct?

5  A    Correct.

6  Q    And those properties are all in her name?

7  A    Yes.

8  Q    And you said that at one time, you believed that one of

9  the properties was connected to Mr. Irsan because he helped in

10 the negotiations; is that correct?

11 A    Yes.

12 Q    Is it strange that if a daughter wanted to buy a piece of

13 property, her father would help her negotiate?

14 A    No.

15 Q    And so, again, the properties that you testified about are

16 all in Nadia's name?

17 A    Yes, and/or Ms. Alrawabdeh.

18 Q    But not Mr. Irsan?

19 A    No, sir.

20 Q    Okay.  There were some cars you testified about that,

21 again, are not connected to Mr. Irsan; is that correct?

22 A    That's correct.

23 Q    So as I recall, when the Government initiated and said

24 that for probable-cause purposes, you talked about whether or

25 not they were married as an indicia of fraud; is that correct?

Dickens – Cross / By Mr. Diaz                                   34

1   A     Yes.

2   Q     We talked about a bank account which has apparently no

3   indication with Mr. Irsan; is that correct?

4   A     No, I --

5   Q     I understand you don't agree with me --

6   A     No, I don't agree.

7   Q     -- about the bank account --

8   A     Okay.

9   Q     -- correct?

10  A     Correct.

11  Q     Then we talked about the properties?

12  A     Correct.

13  Q     And the vehicles?

14  A     Yes.

15  Q     Okay.  Is there anything that I'm leaving out that the

16  Government alleges Mr. Irsan failed to disclose in order to

17  receive benefits?

18  A     Yes.

19  Q     What's that?

20  A     Mr. Irsan serves as the fiduciary for two of his other

21  kids' SSI benefits, Neseem (phonetic) Irsan and Nada (phonetic)

22  Irsan.  As part of his reporting responsibilities as the

23  representative payee for these, he's required to report any

24  foreign travel involving these beneficiaries that would be in

25  excess of 30 consecutive days and on two occasions, Mr. Irsan

1   failed to report that Neseem Irsan left the country for more

2   than 30 consecutive days which caused a loss to the United

3   States government.

4   Q    Which did what?

5   A    Which caused a loss to the government.  He -- basically he

6   was -- Mr. Irsan received excess SSI benefits as Neseem Irsan's

7   representative payee based on his failure to report Neseem's

8   foreign travel.

9   Q    And I'm sorry.  I'm having a hard time hearing you.  Which

10  son was that?

11  A    Neseem.

12  Q    Neseem.  And did you do any investigation into why Neseem

13  was out of the country for longer than 30 days?

14  A    No.

15  Q    No?  So if it was an unexpected -- if it wasn't a planned

16  trip for more than 30 days, that might explain that?

17  A    It would be irrelevant.

18  Q    Well, it would be irrelevant to you but, in other words,

19  if they were planning to leave the country and stay for less

20  than 30 days, that does not need to be reported, correct?

21  A    Correct, only when he stays over 30 days.

22  Q    Correct.  And so if someone were overseas and unexpectedly

23  fell ill and then forgot to report it, I'm not saying it's

24  acceptable but it explains it, correct?

25  A    I guess so.

Dickens - Cross / By Ms. Douenat                    36

1   Q    Okay.  So am I missing anything else as an indicia of

2   fraud --

3   A    No, I don't believe so.

4   Q    -- that you've testified to?

5   A    No, I don't believe so.

6   Q    All right.

7            **MR. DIAZ:**  I have nothing further for this witness,

8   your Honor.

9            **THE COURT:**  Ms. Douenat?

10           **MS. DOUENAT:**  Yes, your Honor.

11                        **CROSS EXAMINATION**

12  **BY MS. DOUENAT:**

13  Q    Agent Pickens, did you review a bunch of records before

14  testifying in the last week or so today -- before testifying

15  today?

16  A    Yes.

17  Q    And you would offer those records in testifying today as

18  your own; is that correct?  Or were you the only agent that

19  wrote those reports?

20  A    No, I was not the only agent that wrote those reports?

21  Q    But you reviewed all of the reports?

22  A    Yes, yes, I have.

23  Q    Including the -- I guess, the reports on the murder cases?

24  A    Yes.

25  Q    And you used those to testify today?

Dickens - Cross / By Ms. Douenat                    37

1   A    Yes.

2         **MS. DOUENAT:**  Your Honor, at this time, I'd like to

3   have a copy of those records for purposes of cross examination

4   under the Rules.  And I'd like a moment to review them real

5   quickly.

6         **THE COURT:**  Go ahead.

7         **(Pause; Court conferred with clerk)**

8         **MS. DOUENAT:**  Thank you.

9   **BY MS. DOUENAT:**

10  Q    Mr. --

11        **MS. DOUENAT:**  They are -- I'm sorry.

12  Q    Mr. Dickens, I just wanted to ask you a few questions.

13  This investigation started with basically Nesreen contacting

14  your office; is that correct?

15  A    Yes.  She made a fraud referral to the Social Security

16  Administration, yes.

17  Q    Okay.  And Ms. Nesreen is the one that also had filed a

18  protective order -- I'm going to go a little bit out of order

19  but -- sequence but is that right?

20  A    Yes.

21  Q    And the protective order was only against her father Ali;

22  is that correct?

23  A    Correct.

24  Q    There is no protective order against Mrs. Alrawabdeh?

25  A    No.

Dickens - Cross / By Ms. Douenat                    38

1   Q     So -- and Ms. Alrawabdeh is not her mother; is that right?

2   A     That is correct.

3   Q     Now, Mr. Irsan and Ms. Alrawabdeh are Muslim; is that

4   right?

5   A     Yes.

6   Q     And Neseem is a Muslim as well?

7   A     Yes.

8   Q     And Nadia is as well?

9   A     Yes.

10  Q     All right.  And during your investigation, you also found

11  out that divorce is not a thing that's done in Muslim law; is

12  that right?

13  A     No, I don't know.

14  Q     Did --

15  A     I didn't research that.

16  Q     -- did Nesreen mention that to you at one point or did you

17  read that in one of the reports?

18  A     I don't recall reading the divorce -- the part about the

19  divorce.

20  Q     Well, that's okay.

21  A     Okay.

22  Q     So -- but you know that they are practicing Muslims?

23  A     That's my understanding, yes.

24  Q     And you also know that Mr. Irsan is married with someone

25  else in the United States?

1   A    I'm unfamiliar with the status of that.  Are you referring

2   to Ms. Jacobs or --

3   Q    I'm referring to Ms. Jacobs, yes.

4   A    Yeah, I'm not familiar with the status -- the legal status

5   of the marriage.  I don't know.

6   Q    But you know that he had a former wife?

7   A    Yes, he did.

8   Q    Okay.  And you don't know whether he's divorced or not?

9   A    No, I don't.

10  Q    And you didn't look it up?

11  A    No.

12  Q    And you weren't informed by any of the witnesses of this

13  information?

14  A    No.

15  Q    Would it surprise you that he's not divorced?

16  A    No, it wouldn't.

17  Q    And Muslims under Muslim law and in Jordan can have more

18  than one wife; is that correct?

19  A    That's my understanding.

20  Q    But it's not recognized in the United States; is that

21  right?

22  A    No, it's not.

23  Q    Nesreen, when she communicated with you, her concerns were

24  mainly about her father; is that right?

25  A    Yes.

Dickens - Cross / By Ms. Douenat                    40

1   Q    And her sister Nadia?

2   A    I don't -- I don't really know how to answer that

3   question.  It was more directed towards her father.

4   Q    And the fact that her sister Nadia had bank accounts and

5   access to the money and the father didn't trust her?  It's in

6   the complaint.

7   A    Yes, her father did not trust her is what she said.

8   Q    Right.  And that -- but she did trust Nadia?

9   A    He trusted Nadia, yes.

10  Q    Right.  So Nesreen told you this information.  That's how

11  you found out that information?

12  A    Correct.

13  Q    Right.  So pursuant to Nesreen, there is this mistrust of

14  her and a trust of Nadia from the father?

15  A    Yes.

16  Q    All right.  And Nesreen was the one that was married to

17  Coty; is that right?

18  A    Yes.

19  Q    And was there a relationship between Nadia and Coty?

20  A    No.  That was with Coty's twin brother Cory.

21  Q    So there was a relationship with Cory and Nadia?

22  A    My understanding is that Nadia was romantically interested

23  in Cory, who is Coty's twin brother, at one point.

24  Q    And was there any threats made by -- in fact, there were

25  threats made by Nesreen to Mr. Irsan and the family; is that

Dickens - Cross / By Ms. Douenat                           41

1    right?

2    A     No.

3    Q     There were never -- there was never an offense report

4    filed from the family saying that they had received a call and

5    being threatened by Nesreen?

6    A     Mr. Irsan had -- yes, Mr. Irsan did report being -- that

7    Nesreen tried to kill him.

8    Q     Right.  So there was a report such as that?

9    A     Sure.

10   Q     Okay.  Nothing was -- came of it but there was a report

11   filed?

12   A     Yes.

13   Q     Um, now we're going to go to the basis of the probable

14   cause in the fraud.  You mentioned the fact that the bank

15   account was in Nadia's name; is that right?

16   A     Yes.

17   Q     And it's not in Ms. Alrawabdeh's name?

18   A     It is not.

19   Q     And the money from the personal injury claim was not in

20   Ms. Alrawabdeh's name; is that right?

21   A     No, it's not.

22   Q     And it was a personal injury that was received by

23   Mr. Irsan?

24   A     That's correct.

25   Q     And the check was actually written to Mr. Irsan?

 1   A     Correct.

 2   Q     And the properties that you mentioned, most of them were

 3   under Nadia's name; is that right?

 4   A     Correct.

 5   Q     Except for one property, you said, that was under

 6   Ms. Alrawabdeh's name?

 7   A     Yes, it was.

 8   Q     And what property was that?

 9   A     It's 19201 Irwin Keel.

10   Q     And that's the actual family residence?

11   A     No, that's the family -- that's a residence that's located

12   across the street from the family residence.

13   Q     And whose name is that in, just hers?

14   A     It's in Shmou and Nadia's name.

15   Q     And how much is that property?

16   A     I believe it was originally purchased for $38,000.

17   Q     It's a residence?

18   A     Yes, there's two mobile homes on the property.

19   Q     So that would be an asset that Ms. Alrawabdeh had; is that

20   right?

21   A     That's correct.

22   Q     And you mentioned she had a vehicle as well?

23   A     Yes.

24   Q     One vehicle?

25   A     Correct.

Dickens - Cross / By Ms. Douenat                                    43

1   Q    And that vehicle was a Toyota Corolla?

2   A    I believe it's a Camry.

3   Q    Camry, okay.  And that's in her name?

4   A    I believe so.

5   Q    Other than that, she had no other property?

6   A    No.

7   Q    And you are also aware that she is receiving SSI?

8   A    Yes.

9   Q    And you saw that there were prescription bottles from

10  doctors where she receives prescriptions for certain

11  psychotropic -- for psychological conditions; is that right?

12  A    Yes.

13  Q    Are you alleging that she is not disabled or that she is

14  disabled?  I just want to know.

15  A    I'm not alleging either way.  I have no --

16  Q    But --

17  A    -- no opinion on her disability.

18  Q    Okay.  The fraud is based on the resource aspect?

19  A    Correct.

20  Q    Okay.  Not on whether she's disabled or not?

21  A    That is correct.

22  Q    Okay.  That's just where I was trying to go.

23  A    Okay, yeah.

24  Q    I'm sorry.

25  A    That's all right.

Dickens - Cross / By Ms. Douenat                    44

1   Q    But as far as all the other property and all the other

2   money, they were either in bank accounts under Nadia's name or

3   Mr. Irsan's name; is that right?

4   A    Correct.

5   Q    Now, you weren't present when the vehicles were purchased;

6   is that right?

7   A    Right, I was not.

8   Q    So you're not sure if Mr. Irsan is the one that came in

9   with the money to buy the vehicles or Nadia came in to buy the

10  vehicles or who paid for the vehicles?

11  A    I'm not.

12  Q    Or who provided the vehicles for the family?

13  A    I'm not.

14  Q    Now, Nesreen, you mentioned, was friends with Gelareh?

15  A    Yes.

16  Q    And they had been friends for a while?

17  A    Yes.

18  Q    And it's normal for family members to know friends of

19  their step-daughters or daughters; is that right?

20  A    Yes.

21  Q    And have numbers of their step-daughters or daughters in

22  their phones?

23  A    Yes.

24  Q    Now -- so you mentioned that Nesreen had lived with her

25  family until about 2011 when she ran away?

1   A    Yes, June 2011.

2   Q    Okay.  And she ran away to elope and get married with

3   someone who was not Muslim; is that right?

4   A    That is correct.

5   Q    And that's -- that was a problem with the family?

6   A    That's my understanding.

7   Q    And it was a -- just more of a religious difference, I

8   guess?

9   A    Yeah, she married a Christian guy.

10  Q    Non -- right, a non-Muslim.  And -- but she's still a

11  family member and families care about each other; is that

12  right?

13  A    Are you speaking to them or --

14  Q    I mean, families, generally speaking, want to know where

15  their members are.

16  A    Typically.

17  Q    And it's normal for family members to want to know what's

18  going on with their daughters and try to patch things up?

19  A    Sure.

20  Q    And Ms. Alrawabdeh has never -- and the witnesses at least

21  in these reports that I've read, none of them say that

22  Ms. Alrawabdeh has threatened them?

23  A    No.

24  Q    And, again, she's not the one that had the temporary

25  restraining order filed against her?

Dickens - Cross / By Ms. Douenat                46

1   A    No, she didn't.

2   Q    The silver vehicle that was seen living -- leaving the

3   scene of Gelareh's murder by a witness, was a license plate

4   given or just a mark and model and color of vehicle?

5   A    Just a description of the vehicle.

6   Q    Without a license plate?

7   A    Correct.

8   Q    So there are many vehicles that are silver in Houston at

9   least -- Houston proper?

10  A    Yes.

11  Q    And you mentioned the fact that this was in the evening --

12  A    Yes.

13  Q    -- 23:44 p.m. --

14  A    Yes.

15  Q    -- leaving?  And then you further stated that law

16  enforcement officers drove the same route during the day?

17  A    No, I --

18  Q    You would agree with me that during the day --

19  A    I believe they drove it at the same time.  They re-drove

20  it at the same time.

21  Q    That's not what you testified earlier but --

22  A    Oh, okay.  Well, I'm sorry.  I meant that they drove it

23  again at the same time of day and it took them the same amount

24  of time.

25  Q    And you would agree that there are a lot of vehicles that

Dickens - Cross / By Ms. Douenat                    47

1    go through the highways in Houston on the way to Conroe on a

2    daily basis?  Traffic is -- this is one of the cities where

3    traffic is bad either going northbound or southbound?

4    A    Yes.

5    Q    And there are many vehicles that are silver?

6    A    Yes.

7    Q    When the vehicle was stopped, no weapons were found in the

8    car; is that correct?

9    A    The -- my -- the vehicle was not searched.

10   Q    So they were not a suspect at that point?

11   A    No.

12   Q    Ms. -- and Ms. Alrawabdeh is not charged with murder?

13   A    No, she's not.

14   Q    She's not charged with accessory to murder either?

15   A    No.

16   Q    And she is not the fiduciary for either Nada or Neseem?

17   A    No, she is not.

18   Q    In fact, Nadia is not her daughter?

19   A    No, she's not.

20   Q    When they were arrested, they were arrested at Oak -- it

21   was a different --

22   A    They were in 21269 White Oak.

23   Q    I'm sorry?

24   A    21269 White Oak --

25   Q    White Oak, okay.

1   A     -- in Conroe.

2   Q     That's where you arrested Mrs. Alrawabdeh; is that

3   correct?

4   A     And Mr. Irsan, yes.

5   Q     And Mr. Irsan.  And at that location -- that's -- and

6   whose property is that under?

7   A     That is a property owned by Nadia.

8   Q     So Nadia owns that property and you arrested both of them

9   there and Ms. Alrawabdeh mentioned that she was living there;

10  is that correct?

11  A     No, she did not.

12  Q     I thought you said that she had said that everything in

13  the house was hers?

14  A     That is another property owned by Nadia at 18470 Old

15  Houston Road.  They departed from Old Houston and traveled to

16  White Oak at which time they were arrested.

17  Q     Okay.  So the home that was searched that had the

18  prescription bottles was where?

19  A     Is where Mr. Irsan and Ms. Alrawabdeh left from, where

20  they had spent the night.

21  Q     Okay.  So it's Old Houston Road.  And that one is another

22  property listed under Nadia's name?

23  A     Yes.

24  Q     Okay.  And at that property, you found prescription

25  bottles with Ms. Alrawabdeh's name on them?

Dickens - Cross / By Ms. Douenat                              49

1   A    I'm not for sure -- I'm not certain who all's names were

2   on the prescription bottles at that residence.  I just know

3   that they were -- prescriptions were recovered at that

4   residence.

5   Q    But you were concerned about the prescriptions and you

6   didn't check whose name they were under and who they belonged

7   to?

8   A    Yes, we found many in her name at --

9   Q    So there were --

10  A    -- 19150.  I wasn't at that location, ma'am.  I was at

11  19150 Irwin Keel.

12  Q    Okay.  But you read a report though and you spoke to some

13  of the officers; is that right -- that were at that location?

14  A    Yes.

15  Q    And it matched with the fact that she was living at that

16  location in Old School Road, the fact that she had belongings

17  there with stuff with her name on it?

18  A    Yes.

19  Q    When the arrests was made -- were made, the passports were

20  seized as well; is that correct?

21  A    Yes.

22  Q    So you have in your possession Ms. Alrawabdeh's passport?

23  A    We haven't gone through all of the passports.  There's

24  multiple passports in seven different bags and it's still being

25  inventoried by FBI right now.

1  Q    Could you at least give us an idea by Monday if you have

2  Ms. Alrawabdeh's passport?

3  A    Sure.  I don't think that would be a problem.

4  Q    You do know that she is from Jordan although she is a U.S.

5  citizen; is that right?

6  A    Correct.

7  Q    And her kids are U.S. citizens?  She does have kids with

8  Mr. Irsan; is that right?

9  A    Yes.

10 Q    How many?

11 A    She has eight with him.

12 Q    Biological kids?

13 A    Eight biological with him, yes.

14 Q    And of those eight, how many are in CPS custody?

15 A    The last information I obtained was that -- and I'm sorry.

16 Give me a second here.  One of them left CPS custody on the

17 date -- the date of the arrest and I don't know if he's in CPS

18 custody at this point or not.

19 Q    So there are seven children under age in CPS custody at

20 least?

21 A    Let's see now.  I'm not certain on the number of children.

22 I'm trying to -- I know them but I'm trying to see a list.  It

23 would be -- she would only have -- she would only have -- they

24 only have six that would have been ineligible because both

25 Neseem and Nyel (phonetic) are over 18.  So there would only be

1   six --

2   Q     Six?

3   A     -- that would have been qualified as minors.

4   Q     So there's six in CPS custody and two are considered

5   adults and not in CPS custody?

6   A     Correct.

7   Q     But the other two are hardly adults.  They're just -- they

8   just turned 17 and 18 or they're 17 and 18.  They're not, like,

9   20 and 27?

10  A     Right.

11  Q     And Ms. Alrawabdeh is 36; is that right?  Or

12  approximately?

13  A     Yes.

14  Q     So her oldest child is 18?

15  A     Eighteen or 19.

16  Q     And her youngest would be 3?

17  A     Correct.

18          THE COURT:  Mr. Dickens, let me ask you.  I'm

19  checking my notes.  She was arrested at the address on White

20  Oak?

21          THE WITNESS:  In route to that address, your Honor--

22          THE COURT:  In route?

23          THE WITNESS:  -- from -- on a traffic stop from --

24  they arrested her and Mr. Irsan on a traffic stop in route from

25  Old Houston Road to White Oak but they had arrived at the

Dickens - Cross / By Ms. Douenat                    52

1   location, is my understanding, when they did the traffic stop.

2   I was not on scene there.

3            THE COURT:  All right.  So they were coming from Old

4   Houston Road and you know that -- the address on Old Houston

5   Road because you followed them?

6            THE WITNESS:  Yes, your Honor, we had agents follow

7   them.

8            THE COURT:  And had they spent the night there?  What

9   time were they arrested?

10           THE WITNESS:  It was early in the morning and, yeah,

11   all indication is they had spent the entire night at that

12   residence.

13           THE COURT:  At Old Houston Road.  They were traveling

14   to the White Oak address?

15           THE WITNESS:  Correct.

16           THE COURT:  All right.  And you stated that she had

17   belongings at the Old Houston Road address?

18           THE WITNESS:  Yes, there --

19           THE COURT:  Or you don't know?

20           THE WITNESS:  I don't know.  I wasn't in there and I

21   didn't make that -- I never made that scene.  So I don't know

22   exactly what all was inside the residence.

23           THE COURT:  Because you searched the 19150 Irwin

24   Keel?

25           THE WITNESS:  Yes and 19201.

1          **THE COURT:**  And 19201.

2          **THE WITNESS:**  Correct.

3          **THE COURT:**  Did she have any belongings in those

4    residences?

5          **THE WITNESS:**  Some, yes, at 19150.

6          **THE COURT:**  19150.

7          **THE WITNESS:**  There was no clothing or anything at

8    19201.

9          **THE COURT:**  Was anyone living at 19201?

10          **THE WITNESS:**  No.  It didn't appear to be.

11          **THE COURT:**  Okay.

12          **THE WITNESS:**  I don't see how they could.

13          **MS. DOUENAT:**  The only other question I have, your

14    Honor, is --

15    **BY MS. DOUENAT:**

16    Q    Ms. -- do you know how long she was gone every time she

17    would go to Jordan to visit family?

18    A    Yes, we have that information.

19    Q    What is it?  How long was it?

20    A    I don't have it memorized.  I'd have to -- let me see.  I

21    have --

22    Q    Did she always return?

23    A    Yes.  She came back.  I want to say she made nine trips or

24    something, you know, after 2011 -- from 2011 to 2014.

25    Q    I thought you said three trips after 2012?

Dickens - Cross / By Ms. Douenat                    54

1    A    Well, that was just after 2012.  There's at least nine

2    trips --

3    Q    But before that, it was more than that?

4    A    -- at least nine trips total.  The --

5    Q    And her father was deceased.  He died in the meantime as

6    well?

7    A    Yes, I do believe that they -- I understand that they

8    traveled there for a funeral at one point.

9    Q    And you do -- you're going to let us know by Monday if you

10   have her passport?

11   A    Yes, ma'am.

12   Q    And you -- her brother just passed away about three months

13   ago.  Were you aware of that?

14   A    I'm unaware of that.

15   Q    You said that you believed her brother was deceased?

16   A    Uh --

17   Q    The one -- there's a card that you mentioned --

18   A    Oh, you --

19   Q    -- in her possession.

20   A    The card for Usef?

21   Q    Yes.

22   A    Okay.  I'm unaware.  I -- and I understand that he was --

23   the information in front of me, he was deceased prior to three

24   months ago.

25   Q    Okay.

1          **MS. DOUENAT:**  I pass the witness, your Honor.

2          **MR. MC ALISTER:**  Nothing further, your Honor.

3          **THE COURT:**  All right.  Agent, you mentioned in your

4    complaint that Mr. Irsan sold a BMW?

5          **THE WITNESS:**  Yes.

6          **THE COURT:**  Was that his BMW, if you know?

7          **THE WITNESS:**  I don't have -- I don't recall the

8    details of the actual purchase but the individual who was -- he

9    negotiated -- he was negotiating the -- trying to negotiate the

10   purchase of the vehicle from Mr. Irsan.  I don't know -- I

11   don't recall exactly how the vehicle was titled.

12         **THE COURT:**  All right.

13         All right, any questions prompted by that question,

14   Mr. Diaz?

15         **MR. DIAZ:**  No, your Honor.

16         **THE COURT:**  All right, anything else?  If not, you

17   may stand down.

18         **MS. DOUENAT:**  No, your Honor.

19         **THE WITNESS:**  Thank you, your Honor.

20       **(Witness stepped down)**

21         **THE COURT:**  Any other witnesses?

22         **MR. MC ALISTER:**  No, your Honor.  The Government

23   rests now.

24         **THE COURT:**  All right.

25         **MS. DOUENAT:**  And we'll present our case on Monday.

1          **THE COURT:**  Present your case on Monday.  Do you have

2    any argument?

3          **MS. DOUENAT:**  On Monday.

4          **THE COURT:**  Mr. Diaz?

5          **MS. DOUENAT:**  Oh, I'm sorry, your Honor.

6          **MR. DIAZ:**  Yes, your Honor, we --

7          **THE COURT:**  Do you -- I mean, do you have any

8    witnesses?

9          **MR. DIAZ:**  No.

10         **THE COURT:**  Okay.

11         **MR. DIAZ:**  And with regards to Monday, we're resting.

12         **THE COURT:**  All right.  So argument on Mr. Irsan.

13         **MR. MC ALISTER:**  Your Honor, we would ask that

14   Mr. Irsan be detained.  We believe that we've established

15   probable cause.  We believe he should not be given a bond.  The

16   reasons that he should not be given a bond are, number one,

17   he's -- he is a flight risk.  He has multiple credit cards in

18   multiple names.  He has the ability to go back to Jordan and

19   live with family.  I'm uncertain about the identities that he

20   may have or be able to assume.

21         And more than that even, Mr. Irsan -- it would not be

22   unusual for him to try to intimidate a witness.  He's been

23   under a protective order in the past and even after that

24   protective order was issued by the Court, he made no effort to

25   abide by it.  He still tried to track down his daughter.  He

1      certainly, Harris County believes, tracked down Coty Beavers

2      and killed him.  He tracked down Gelareh Bagherzadeh and killed

3      her.  We certainly have probable cause to believe that based on

4      the Harris County indictment.

5             These individuals, if he perceives them as a threat,

6      he's more than willing to cause bodily injury or to intimidate

7      a witness.  So we believe he should not be released for all

8      those reasons.

9             **THE COURT:**  All right.  Mr. Diaz.

10            **MR. DIAZ:**  Your Honor, with regard to release and

11     bond, as you can see from the Pretrial Services Report, he's

12     not seeking release.  He's not asking the Court for a bond.  We

13     wanted to have the hearing merely for the opportunity to

14     challenge the probable cause.  So as to the rest of it, we have

15     nothing more to add for the Court to set a bond in this case.

16            **THE COURT:**  All right.  Do you have an argument on

17     probable cause?

18            **MR. DIAZ:**  Only that we feel obviously from the

19     testimony that it fell short of showing that he committed the

20     actual fraud alleged.  Either he was or wasn't married.  I'm

21     not sure because we didn't check records.  Maybe there's a

22     record of another marriage.

23            There's a bank account that he's not connected to

24     that we can't show payments that he received any payments to.

25     There's apparently a check from a company for $75,000 deposited

1  that was in his name and apparently signed over to his daughter

2  but it wasn't disbursed to him.  There are multiple properties

3  that his daughter owns not in his name and so I would argue

4  that it fell short.

5          **THE COURT:**  All right.  I disagree.  I find that

6  there is probable cause to believe that Mr. Irsan violated

7  Section 641 of Title 18, conspired to do so and also conspired

8  and violated Section 1383(a)(2) of Title 42.  Where the Court

9  finds probable cause with respect to the issue of detention, he

10 is detained.  The Court finds that he presents not only a

11 serious risk of flight but a danger to the community.  So he

12 detained.  I will see you back Monday at 2:00 o'clock.

13          **MS. DOUENAT:**  Thank you, your Honor.

14          **THE COURT:**  All right.

15          **MR. DIAZ:**  Thank you, your Honor.

16          **THE COURT:**  All right, we're in recess.

17          **MS. DOUENAT:**  Thank you, your Honor.

18          **THE CLERK:**  All rise.

19      **(This proceeding adjourned at 11:32 a.m.)**

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



_____            _July 29, 2014  _


                    TONI HUDSON, TRANSCRIBER