THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

* * * * *

UNITED STATES OF AMERICA      *      NO. H-14-CR-248-1
                              *      Houston, Texas
VS.                           *
                              *      2:13 p.m. – 2:45 p.m.
ALI MAHMOOD AWAD IRSAN        *      July 6, 2015

* * * * *

**SENTENCING**

BEFORE THE HONORABLE LYNN N. HUGHES
UNITED STATES DISTRICT JUDGE

* * * * *

**THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE
UNDER THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS
AUTHORIZED BY COURT ORDER.   UNAUTHORIZED REPRODUCTION
WILL RESULT IN AN ASSESSMENT AGAINST COUNSEL FOR THE
COST OF AN ORIGINAL AND ONE COPY AT THE OFFICIAL RATE.
General Order 94-15, United States
District Court, Southern District of Texas**

Proceedings recorded by electronic sound recording
Transcript produced by transcription service

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 * 866-993-1313

1    **APPEARANCES:**

2    For the United States:

3         MR. JAMES D. MCALISTER
          **U.S. Attorney's Office**
4         1000 Louisiana, Suite 2300
          Houston, Texas 77002

5    For the Defendant:

6         MR. JOHN T. FLOYD, III
          **Attorney at Law**
7         The Kirby Mansion
          2000 Smith Street
8         Houston, Texas 77002

9    Case Manager:

10        GLENDA HASSAN

11   U.S. Probation Office:

12        R. MEJIA
13        H. MEJIA

14   Electronic Recorder:

15        ROSARIO SALDANA

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2          **2:13 P.M. – JULY 6, 2015**

3          THE COURT:  *United States of America vs. Ali*

4     *Mahmood Awad Irsan.*

5          MR. MCALISTER:  Jim McAlister for the

6     Government.

7          MR. FLOYD:  John Floyd for Mr. Ali Irsan, Your

8     Honor.

9          THE COURT:  Good afternoon, Mr. Floyd.

10         MR. FLOYD:  Good afternoon, Your Honor.

11         THE COURT:  Would you raise your right hand,

12    please, sir.  Do you solemnly swear the testimony you

13    give will be the truth, the whole truth, and nothing

14    but the truth?

15         DEFENDANT IRSAN:  I do, Your Honor.

16         THE COURT:  All right.  Mr. Floyd?

17         MR. FLOYD:  You need to speak up.

18         DEFENDANT IRSAN:  I do, Your Honor.

19         THE COURT:  Thank you.  Move it down.  You

20    don't need -- Mr. Floyd, he needs it, you don't.

21         MR. FLOYD:  Yes, sir.

22         THE COURT:  You have a reasonably good

23    projection.

24         MR. FLOYD:  Thank you, Your Honor.

25         THE COURT:  You use it too often, though.

1          All right.  Mr. McAlister, does the

2   Government have a recommendation?

3          MR. MCALISTER:  We do, Your Honor.   In this

4   particular case we would ask that the Court apply the

5   sophisticated means.

6          THE COURT:  Well, all right, you want to start

7   with that stuff?

8          MR. MCALISTER:  Yes, sir.  And then the range,

9   if sophisticated means is applied, is 30 to 37, and

10  we'd ask for the high end for this particular

11  defendant.

12          THE COURT:  And what do you say the range is

13  for -- with sophisticated means?

14          MR. MCALISTER:  30 to 37 months, Your Honor,

15  if the sophisticated means applies.

16          THE COURT:  All right.  You want to talk about

17  that.

18          MR. FLOYD:  Just very briefly, Your Honor.  I

19  know you've already heard this case twice before on

20  this particular issue.

21          The thrust of the argument is just simply

22  that Mr. Irsan's actions which constitute the basis of

23  this offense are really failing to disclose these

24  assets.

25          THE COURT:  No, they're not failing to do

1  anything.

2          MR. FLOYD:  Yes, Your Honor.

3          THE COURT:  They're intentionally,

4  deliberately, with malice aforethought, lying to the

5  Government, plus a few.  There are other acts.

6          MR. FLOYD:  Yes, sir, Your Honor.

7          THE COURT:  The other acts are he used his

8  very young wife and his daughter to be couriers for and

9  depositories of funds that he imported from abroad so

10 he could live comfortably while living on welfare that

11 he didn't earn.

12         MR. FLOYD:  Yes, sir.

13         THE COURT:  A quarter of a million dollars.

14 And ordinarily, something like stealing a credit card

15 or maybe even lying on your Social Security form, but

16 to sustain yourself by importing funds from Jordan or

17 any place else and engaging in the management of your

18 family members whom you entice to become felons, that's

19 a lot more sophisticated than what they did.  That's

20 why they didn't get it and he will.

21             And then we have -- well, I'm not going to

22 rule about anything.  There's a lot of data in there --

23         MR. FLOYD:  Yes, sir, Your Honor.

24         THE COURT:  -- that the state cases are

25 reported.  I'm not adopting them as factual, but --

1   well, it is factual that they exist.  It's not

2   factual -- it is also factual he has not yet been

3   adjudicated --

4            MR. FLOYD:  Yes, sir, Your Honor.

5            THE COURT:  -- one way or the other.

6            And I want to address the acceptance of

7   responsibility with you.

8            Again, here in his letter of acceptance

9   of responsibility, he says, "I am deeply sorry that I

10  failed to disclose -- failed to disclose."  You

11  transferred a couple of hundred thousand dollars among

12  continents and among family members so they wouldn't

13  know.  You know, they check sometimes these things.

14  And if they had checked, they wouldn't have found all

15  the money that you lied about.  And a lie is not a

16  failure, it's an intentional deceit.

17           And then you say you take responsibility

18  and regret putting your family in -- and I'm going to

19  quote this -- "such a difficult situation." You made

20  criminals out of them, who did nothing but love and

21  trust you.

22           "I'm extremely upset that my actions

23  caused my family to be in such trouble." You're not

24  upset that you stole from a bunch of people who

25  actually deserve the benefits?  You're not upset that --

1  Mr. McAlister is probably only the pinpoint.  He's only

2  the surface.  You've already seen probably a dozen

3  Health and Human Services Officers and six FBI and all

4  kinds of other people that came out and took away

5  records and stuff.  The people of the United States,

6  through its monumentally inefficient government, they

7  probably spent a hundred, hundred and fifty thousand

8  dollars on this case.

9             You love your children dearly, you say

10 here.  Which children?  The ones you had be couriers

11 for your money, the one who filled out forms and lied

12 for you.  You love them dearly?  I'd hate to see what

13 you would do to somebody you didn't like.

14             And then you pray that your children are

15 safe and well taken care of.  Really?

16             Mr. Irsan, you no more accept

17 responsibility for this --

18          DEFENDANT IRSAN:  I do, Your Honor.

19          THE COURT:  Pardon?

20          DEFENDANT IRSAN:  I do.

21          THE COURT:  No, you don't.  This is a dodge,

22 this is a whine.  You're worried about you, you're

23 worried about your children.  You don't say anything

24 about the other 310 million people you stole from.

25 Add it all up.  You've cost the people a whole bunch of

1 money, the people in a country that gave you a life you

2 couldn't have had anywhere else that you were.  Could

3 you?  No.

4          The televisions and the cars, the air

5 conditioning.  America was generous to you.  And your

6 response was to steal from it.  Your response was to

7 make your family have to live with the dishonor.  Most

8 kids don't like their father being a crook, probably

9 don't like it that their mother is a crook and their

10 aunt is a crook.  It's all because of you.  You should

11 have thought about the little children that are in

12 Child Protective Services before you decided to do

13 this, but you didn't.  You thought about yourself.

14          The daughter wanted a career in medicine.

15 She can't have one now.  No hospital is going to hire

16 somebody with a felony fraud conviction.  They can't do

17 it.  The risk is too high.

18          So you don't get the reduction for

19 acceptance of responsibility.

20          How is it we have an acceptance letter

21 dated May 27th when the case wasn't filed until June

22 18th?

23          MR. FLOYD:  That must have been my error, Your

24 Honor.  I did meet with Mr. Irsan and we went over what

25 he wanted to say, I typed it up, and I took it back out

1  to the jail.  We read over it and then signed it.

2         THE COURT:  So, apparently, there was a

3  Complaint that lingered before the Indictment?

4         MR. FLOYD:  Yes, sir, Your Honor, there was a

5  Criminal Complaint filed initially.

6         MR. MCALISTER:  There was a Complaint.

7         THE COURT:  So that must be the origins of the

8  letter's date.  It was right after the Indictment,

9  apparently.

10         MR. FLOYD:  Your Honor, it was a mistake on my

11  part.

12         THE COURT:  I know.  Or maybe it wasn't a

13  mistake.  It's just the things he files and does and

14  everything.  You just got it done early.

15         MR. FLOYD:  I would like to take credit for

16  that, but I can't imagine it's true.

17         THE COURT:  It's not a problem.  I just was

18  curious.

19         MR. FLOYD:  Yes, sir.

20         THE COURT:  Apparently, he didn't read it as

21  carefully as I did.

22         All right.  Mr. Irsan, do you have

23  anything you'd like to tell me?

24         DEFENDANT IRSAN:  Your Honor, in 1990 --

25         THE COURT:  Use the microphone.

```
1              DEFENDANT IRSAN:  Yes, Your Honor.

2              THE COURT:  Please.

3              DEFENDANT IRSAN:  I am very sorry about not

4    reporting.  But in regard to the bank account in

5    Jordan, in 1990, I went overseas after the Gulf War

6    because I was -- people tried to hurt me because they

7    thought I was from Iraq.  So I grabbed my family, sold

8    my house, liquidated my assets and went overseas, me

9    and my wife and my four girls.

10             We lived in Jordan from 1991 until 1993.

11   My kids had a hard time with the language, school, so I

12   decided to come back to the United States.  I withdraw

13   all the money out of the bank account and came back to

14   the United States.  The account, it had $58 left in it,

15   which is mine.  The account was in U.S. dollars in

16   Jordan because I have U.S. -- I am U.S. citizen.  So,

17   in Jordan, usually you have your bank accounts in their

18   currency.

19             THE COURT:  Wait a minute, say that again.  In

20   Jordan --

21             DEFENDANT IRSAN:  You have -- if you have a

22   bank account as a Jordanian or as, you know, you have a

23   bank account in Jordanian dinars.  But because --

24             THE COURT:  That would make sense.

25             DEFENDANT IRSAN:  Because I was a U.S.
```

1  citizen, I could have a bank account in the bank with

2  U.S. dollars.

3          When I left overseas and came back to the

4  United States, I had $58 left in the account.  And the

5  account, because they don't charge you over every

6  month, I didn't even know there was $58 left.  I just

7  grabbed the kids and got my kids and came back so they

8  can school and language and all.  So we came to the

9  United States in 1993.

10         In 2001, the bank account had only very

11  minimum $58 that same month was left in it.  My father

12  was sponsor and helping two of his grandkids going to

13  college, one in Lithuania Russia, and one in Egypt.

14  And my father was helping his grandchildren with

15  financials.  So he was sending them U.S. dollars.  They

16  had to have U.S. dollars.

17         After the Gulf War, they had hard time

18  getting U.S. --

19         THE COURT:  In Lithuania?

20         DEFENDANT IRSAN:  Yes, in Russia.

21         THE COURT:  Smart people.

22         DEFENDANT IRSAN:  Yes.

23         THE COURT:  Not taking ruble.

24         DEFENDANT IRSAN:  Yeah, U.S. dollars are

25  accepted everywhere.  So, for their schooling, they

 1   used to send them U.S. dollars Egypt -- and for college

 2   entrance.

 3            So the bank account, my family -- my

 4   father -- my brother, in 1991 or 1990, I give him a

 5   power of attorney to represent me if I wasn't there

 6   and he needed to get money out while I was living in

 7   Jordan.  That power of attorney stayed with him.

 8            In 2001, my family, my father asked me if

 9   they can use the account so they can have access to the

10   U.S. dollars since the account is still in my name.  So

11   they start using the account, putting money in there so

12   they can have U.S. dollars, they can withdraw --

13            THE COURT:  So you're cheating the Jordanian

14   Government?

15            DEFENDANT IRSAN:  No, no, they're not

16   cheating.  They just have access to U.S. dollars --

17            THE COURT:  No, Jordanians are not supposed to

18   have a dollar account; right?

19            DEFENDANT IRSAN:  Well, for some

20   circumstances --

21            THE COURT:  No, now, you're dancing.

22            DEFENDANT IRSAN:  My father asked me and I

23   didn't know anything about legalities, so I said, okay,

24   you can use my account.

25            THE COURT:  All right.

```
 1              DEFENDANT IRSAN:  And that was the end of it.
 2              THE COURT:  I don't care whether you thought
 3  about it.  You just explained to me you were violating
 4  Jordanian law by allowing non-U.S. citizens to use your
 5  dollar account.
 6              DEFENDANT IRSAN:  Well, I didn't think of it
 7  that way at this time.
 8              THE COURT:  Well, you know, I don't even know
 9  who's the king of Jordan any more, but --
10              DEFENDANT IRSAN:  Abdullah.
11              THE COURT:  Abdullah might have thought of it
12  that way.
13              All right, so that's your first bank
14  fraud.
15              DEFENDANT IRSAN:  That's it.  The money was
16  into the account or out of the account.  I had nothing
17  to do with it, I didn't know anything about it.  It
18  wasn't my money, and that was the end of it.
19              THE COURT:  All right.  When your wife and
20  daughter brought a hundred thousand dollars back to
21  this country, where did that money come from?
22              DEFENDANT IRSAN:  But it wasn't anything to do
23  with that.
24              THE COURT:  What?
25              DEFENDANT IRSAN:  It wasn't anything from that
```

1   account.  That account, I had nothing to do with it.

2           THE COURT:  What was it?

3           DEFENDANT IRSAN:  I'm sorry?

4           THE COURT:  Where did you get the hundred

5   thousand dollars that you --

6           DEFENDANT IRSAN:  My father sent to my

7   daughter for her education.  He wanted her to go to

8   school.

9           THE COURT:  I don't believe that's consistent

10  with the testimony of the others.

11          DEFENDANT IRSAN:  Well, that's what happened,

12  Your Honor.

13          THE COURT:  Oh, yeah, because you're an

14  authority on propriety.  Where did your father get a

15  hundred thousand dollars?

16          DEFENDANT IRSAN:  He used to own a property

17  close to a university.  It was agriculture.  And after

18  they had the university, they took land.

19          THE COURT:  And they paid him in dollars?

20          DEFENDANT IRSAN:  They paid -- no, they paid

21  him in -- they paid him in -- I don't know, they paid

22  him in currency, their currency, I guess.

23          THE COURT:  Now, where is he now?

24          DEFENDANT IRSAN:  I'm sorry?

25          THE COURT:  Where is your father?

 1           DEFENDANT IRSAN:  My father, he passed away in

 2   2012.

 3           THE COURT:  Well, where was he when he was

 4   manipulating the bank account?  Where?

 5           DEFENDANT IRSAN:  He was in Jordan.  My dad

 6   was.

 7           THE COURT:  All right, so that's dinars.

 8           DEFENDANT IRSAN:  Huh?

 9           THE COURT:  Is that dinars?  The currency.

10           DEFENDANT IRSAN:  Yes.

11           THE COURT:  Well, why did you say you didn't

12   know what currency he used?  You told me it was dinars

13   a moment ago.

14           DEFENDANT IRSAN:  Yes, sir.  Yes, Your Honor.

15           MR. MCALISTER:  Your Honor, may I interject for

16   a moment?

17           THE COURT:  Yes, sir.

18           MR. MCALISTER:  If the story is true about the

19   money being brought to the United States for the purpose

20   of education, I could find no place where it was used

21   for that purpose.  Perhaps to buy a book or two, but

22   both of the daughters, when they went to college,

23   obtained grants from the Federal Government and the

24   State for their education.  So, if the money was

25   brought for that purpose, I can't find that it was used

1   for that purpose.

2          THE COURT:  My recollection is they testified

3   consistent with your recollection.

4          MR. MCALISTER:  And also, the daughter, Nadia,

5   when she was questioned upon entering the United States

6   about the transfer of the money, she said it was an

7   inheritance from her uncle and she did not state that

8   it was brought over for any kind of education purposes.

9          THE COURT:  From her grandfather.  No, he says

10  it's grandfather.

11         MR. MCALISTER:  Right.

12         THE COURT:  She said it was uncle.

13         MR. MCALISTER:  Uncle Awad is specifically

14  what she said.

15         THE COURT:  How did it come, in currency?

16         MR. MCALISTER:  We didn't find her with the

17  currency on her, but she was asked about it.  And she

18  told us in a statement that she gave it to friends and

19  they were transported in increments to the U.S.,

20  basically a structuring type scheme of less than

21  $10,000.  And she would not give us the name of anyone

22  that was used to transport the money.

23         THE COURT:  All right.  So she didn't smuggle

24  all the money back in one step -- or she wouldn't have

25  had to smuggle it, she could have simply  disclosed

1   where it came from.

2          MR. MCALISTER:  Correct.  And again, we didn't

3   catch it with her -- the money on her.  But then in the

4   bank account we saw the deposits that you described

5   earlier of at least $9,000 in cash that was deposited

6   and were unsure of the source.  But when asked, that

7   was the answer that she gave us.  No mention of

8   education purposes.

9          THE COURT:  Is that your idea of what happened?

10         MR. FLOYD:  Your Honor, I'm going to advise my

11  client not to answer any more questions.  I think we're

12  getting into an area that could expose him to further

13  criminal liability.

14         THE COURT:  Okay.  He doesn't have to answer

15  them.  He simply can't pretend to tell me a story and

16  then not answer the questions.

17         MR. FLOYD:  Yes, sir, Your Honor.

18         THE COURT:  Out of an abundance of caution, I

19  will let him lately assert his privilege against

20  self-incrimination.

21         MR. FLOYD:  Thank you, Your Honor.

22         THE COURT:  Can he talk about the personal

23  injury settlement?

24         MR. FLOYD:  I'd rather not, Your Honor.  I'd

25  advise him along the same lines.  It is what it is.  We

1 | have --

2 | THE COURT:  All right.  So that pretty much

3 | guts the pretend letter.  He cannot use affirmatively

4 | what cannot be used against him.  And so, but --

5 | MR. FLOYD:  Yes, sir, Your Honor.

6 | THE COURT:  Because this is the United States,

7 | we won't do it even though we could.

8 | Do you understand?

9 | Say "Yes, sir."

10 | DEFENDANT IRSAN:  Yes, sir, Your Honor.

11 | THE COURT:  I'm not going to change the

12 | sentence based on this, but tell me about the sons and

13 | the drugs and taking them to jail.  Unless he tells you

14 | not to.

15 | MR. FLOYD:  Your Honor, I'm again going to

16 | continue to advise him not answer any questions outside

17 | the.

18 | THE COURT:  I understand.

19 | MR. FLOYD:  -- scope of this sentencing, Your

20 | Honor.  Thank you.

21 | THE COURT:  But may I ask you, it is a fact

22 | that they're under a deferred adjudication for having

23 | done that?

24 | MR. FLOYD:  That's correct, Your Honor.  Both

25 | the boys attempted to smuggle pain medicine into Joe

1  Corley inside a Tootsie Roll.

2          THE COURT:  Mr. McAlister, did they say whose

3  idea that was?

4          MR. MCALISTER:  From what I could glean, Your

5  Honor, they talked about it on the telephone, and I'm

6  uncertain whose idea it was.

7          THE COURT:  And there's one other change in

8  the Presentence Report.  It reflects he's not able to

9  pay a fine or restitution.

10         Mr. Irsan, you have completely destroyed

11  anybody's ability to take your report that you have no

12  access to money.  I don't know why you expect me to

13  believe you have no access to money when you've

14  smuggled money into the country, you've stolen money.

15  I don't suggest you steal money to pay your

16  restitution, but I had a guy do that, or that's what he

17  told me.

18         But I'm going to impose a fine and

19  restitution and you're going to be ordered to pay them.

20         DEFENDANT IRSAN:  Yes, Your Honor.

21         THE COURT:  I can't make you have the money,

22  but there will be a whole group of overpaid bureaucrats

23  seeing if they can find the money if you ever get it,

24  however you get it.

25         DEFENDANT IRSAN:  Yes, sir, Your Honor.

1           THE COURT:  Mr. Floyd, you mentioned his

2    well-documented health problems.  Do you know what they

3    are?

4           MR. FLOYD:  I know it just from what he has

5    complained of and what we have seen at Joe Corley.  He

6    has a documented history of having a lot of issues of

7    pain.

8           THE COURT:  Well, tell me what they are.

9           MR. FLOYD:  Well, he has fibromyalgia and --

10          DEFENDANT IRSAN:  Heart disease.  I have a

11   heart disease.

12          THE COURT:  Which one?  There are lots of

13   heart diseases.

14          DEFENDANT IRSAN:  I'm sorry?

15          THE COURT:  There are lots of heart diseases.

16          DEFENDANT IRSAN:  What do they call it?  I

17   have blockages.

18          THE COURT:  So you don't know what's wrong

19   with your heart?

20          DEFENDANT IRSAN:  There is a blockage on my

21   heart.  It's like 90 percent blockage on my heart.  I

22   was going -- I was going to the doctor and they had the

23   whole thing.

24          THE COURT:  Well, I don't have --

25          DEFENDANT IRSAN:  Cardio --

```
1              THE COURT:  Cardiologist.
2              DEFENDANT IRSAN:  Cardio something, the
3    disease I have, I can't remember the name of the
4    disease, but they said I had blockage, about 90 percent
5    on the blood -- on the muscle of the heart itself.
6              THE COURT:  All right, you don't take pain --
7    you don't take pain medicine for that.  Why do you take
8    pain --
9              DEFENDANT IRSAN:  No, pain medicine, I have --
10   I have hemorrhoids, I have discs in my back, I have
11   arthritis in my shoulder.
12             THE COURT:  We all have discs in our back.
13             DEFENDANT IRSAN:  Right.  Well --
14             THE COURT:  Which disc is wrong?  When was the
15   last time you got treatment for it?
16             DEFENDANT IRSAN:  I was getting medicine for
17   the herniated discs in my back.
18             THE COURT:  All right.  And what medicine did
19   you get?
20             DEFENDANT IRSAN:  I was getting -- I was on
21   Percocet and I was on duragesic patches.
22             THE COURT:  You know what those are?
23             MR. FLOYD:  He's on pain medicine, Your Honor.
24             DEFENDANT IRSAN:  Pain medicine.  And also, I
25   was on prostate medicine.
```

1          THE COURT:  What else is wrong with you?

2          DEFENDANT IRSAN:  I get migraines.  I have

3  cluster migraines.

4          THE COURT:  Cluster?

5          DEFENDANT IRSAN:  Yes, sir.  I get it like four

6  or five times sometimes in one day.  The pain goes from

7  zero to about 10 in about two minutes.

8          THE COURT:  Do you get pain medicine for that?

9          DEFENDANT IRSAN:  I was getting Imitrex at one

10  time, but right now I don't have any medication.  They

11  don't give any medicine for pain or anything, except

12  for Tylenol, at the facility where I'm at.  So I just

13  go through the suffering.

14          THE COURT:  Have you been examined by a

15  doctor?

16          DEFENDANT IRSAN:  I was examined by Doctor --

17  at the facility or outside the facility?

18          THE COURT:  Once you were arrested by the

19  Government.

20          DEFENDANT IRSAN:  No, sir, they -- they don't

21  have the testing like other doctors do.  You just go,

22  they talk to you, and they let you go.

23          THE COURT:  Did he listen to your heart?

24          DEFENDANT IRSAN:  A couple of times, yes, sir.

25          THE COURT:  Took your blood pressure?

1          DEFENDANT IRSAN:  Yes, sir.  And I am really

2    sorry about what I have done.  I feel very ashamed of

3    what I did.

4          THE COURT:  Anything else you want to tell me?

5          DEFENDANT IRSAN:  No, Your Honor.

6          THE COURT:  Mr. Irsan, I sentence you to 45

7    months in the custody of the Attorney General, three

8    years of supervised release, restitution of

9    $290,651.90, a hundred dollar Special Assessment,

10   Mr. McAlister moves to remit it.

11          They are going to be -- and this sentence

12   is to be wholly consecutive to any other sentence about

13   anything ever.  And that will be in the judgment.

14          There are a lot of conditions of

15   probation.  In your case, one of them will be that you

16   cannot possess a credit card or other similar device

17   without having written authorization for the specific

18   account and the specific device from the probation

19   officer.  Is that clear?

20          DEFENDANT IRSAN:  Yes, Your Honor.

21          THE COURT:  You are to engage in no financial

22   transaction other than rent to third parties.  For

23   regular utility bills, it is more than $500 cash,

24   check, credit card or trade beads.

25          Can I wait on the schedule since --

1          All right.  When you're at an institution

2   where you can work, and if you work, you will pay the

3   Court towards restitution 20 percent of your gross

4   wages.  Is that clear?

5          DEFENDANT IRSAN:  Yes, Your Honor.

6          THE COURT:  And when you're out, you will pay

7   it at $125 a month starting 60 days after your release.

8          DEFENDANT IRSAN:  Yes, Your Honor.

9          THE COURT:  You're to have -- there are a

10  bunch more and I'm not going to go through them all.

11         You have the right to appeal, you have the

12  right to have a lawyer appointed for you on appeal, and

13  to appeal paying costs -- without paying costs.

14         The Guideline without acceptance is a 22

15  offense level, with Criminal History Level 1.  The

16  range is 41 to 51 months.  And supervised release is up

17  to three years.

18         USPO R. MEJIA:  Was that three years, Your

19  Honor?

20         THE COURT:  Three.

21         USPO R. MEJIA:  Thank you, Your Honor.

22         THE COURT:  Read it, don't just sign it.

23         *[Pause]*

24         MR. FLOYD:  Thank you, Your Honor.

25         THE COURT:  Anything else for the Government?

1          MR. MCALISTER:  No, sir.

2          THE COURT:  Mr. Floyd?

3          MR. FLOYD:  No, sir, Your Honor.

4          THE COURT:  Any questions?

5          DEFENDANT IRSAN:  No, Your Honor.

6          THE COURT:  All right.  You may be excused.

7          *[2:45 p.m. – Proceedings adjourned]*

8

9                    C E R T I F I C A T I O N

10

11      I certify that the foregoing is a correct

12   transcript of the electronic sound recording of the

13   proceedings in the above-entitled matter.

14

15

16   /s/ Gwen Reed

17   8-28-15

18

19

20

21

22

23

24

25